**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Roland C. HANSEN and Steven R.
Hansen, Defendants-Appellants.**

**Nos. 77–1424, 77–1425.**

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1978.

Decided Aug. 15, 1978.

Certiorari Denied Oct. 16, 1978.
See 99 S.Ct. 283.

See also D.C., 422 F.Supp. 430.

Marvin Leavitt, Chicago, Ill., for defendants-appellants.

Thomas E. Martin, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, SPRECHER and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

We consider in these consolidated appeals the jury trial convictions of Roland C. Hansen and Steven R. Hansen, father and son, who were charged along with three others not involved in this appeal, with a sizeable arson-insurance enterprise.[1] The indict-

---

1. Roland C. Hansen, the father, was convicted of conspiracy and substantive racketeering charges, Counts 1 and 2, and mail fraud, Counts 4, 5, 7, 8, 9, 13, 14, 15, 16 and 20, and was sentenced to seven years imprisonment on Counts 1 and 2, and concurrently to five years on each of the mail fraud counts, for a total commitment of seven years.

ment may be characterized as alleging that the five defendants, along with an unindicted co-conspirator, Howard Bloom, and others were engaged in an enterprise whereby they sold properties among themselves, insured those properties at inflated rates, caused them to be burned, and then collected or attempted to collect the insurance proceeds.

There is no need to review in detail the evidence of the particular fires occurring on the eight different properties in Milwaukee, Wisconsin. Numerous employees of insurance agencies and companies testified relative to the processing of insurance applications, proof of loss, the issuance of drafts involving the eight properties, and the items which were sent through the mails in the normal course of business. The insurance witnesses also identified insurance documents which reflected the financial interest of the five defendants in the eight properties in question. There was evidence concerning the ownership of the eight properties. The supervisor of the records of the building inspectors for Milwaukee identified the records kept relative to the eight properties which reflected the notice of violations which had been given to the defendants. The foreman of the grand jury which heard the allegedly perjurious testimony of Steven R. Hansen also testified. The critical testimony was that of Bloom and the codefendants. Bloom, the unindicted coconspirator, testified about his own involvement in the arson-for-profit activities and the involvement of his codefendants. Bloom also authenticated a tape, monitored with his consent by the Federal Bureau of Investigation, of his conversations with Steven R. Hansen and Roland C. Hansen. The three other co-conspirators testified relative to their own involvement and the involvement of the two Hansens.

It is not disputed that the fires were the result of arson. The defenses appear to be based primarily on the alleged lack of credibility of the government's witnesses. The attorney for Steven R. Hansen argued to the jury that the government had rounded up "five liars and thugs to gang up on Steven Hansen," and that there was an effort aided by the government to frame the Hansens. The jury, and not without reason, chose to believe the government's witnesses, some of whom the government admitted "would not qualify as Eagle Scouts." At least the parties seem to agree that the defendants were not very discriminating in their choice of friends and associates. The evidence, however, is more than sufficient to assure that both defendants were guilty beyond a reasonable doubt of all charges, except with regard to the perjury counts against Steven R. Hansen. The issues raised by each defendant are individual and will be considered separately.

Roland C. Hansen argues that there was reversible error in the denials of his various motions for severance denying him a fair trial exemplified primarily by the trial judge's refusal to permit cross-examination of Steven R. Hansen by Roland C. Hansen in violation of the Sixth Amendment; by the calling by Steven R. Hansen of Roland C. Hansen as a witness requiring Roland C. Hansen to object in front of the jury. It is also claimed that in final argument the government made prejudicial references to Roland C. Hansen's failure to testify.

Steven R. Hansen raises various issues alleging: (1) that his Sixth Amendment rights were violated by restrictions imposed on his direct and cross-examination of wit-

---

Steven R. Hansen, the son, was convicted of the conspiracy and substantive racketeering charges, Counts 1 and 2, mail fraud, Counts 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19 and 20, and of giving false testimony before the grand jury, Counts 24 and 25, and sentenced to a term of fourteen years imprisonment on Counts 1 and 2 to be served concurrently with terms of imprisonment of five years on each of the mail fraud and perjury counts, for a total commitment of 14 years.

Codefendant William Zoesch pled guilty to mail fraud, Count 12, and was sentenced to four years imprisonment. Codefendant Chris Caras pled guilty to conspiracy to conduct a racketeering activity, Count 1, and mail fraud, Count 3, and was sentenced to two years imprisonment on each of Counts 1 and 13, to be served concurrently. Codefendant Robert Anton pled guilty to conspiracy to conduct a racketeering activity, Count 1, and was sentenced to two years imprisonment.

nesses; (2) that the trial judge erred in admitting the testimony and certain official records of the supervisor of the Building Inspection and Maintenance Division of the city of Milwaukee; (3) that the court erred in permitting the government to call as a witness the foreman of the grand jury which had indicted the defendants; (4) that the perjury evidence was insufficient; (5) that the trial judge was not impartial; and (6) that the sentence was based on improper considerations and was excessive.

## I.

### Roland C. Hansen's Issues

Roland C. Hansen moved unsuccessfully before trial and during trial for severance. He argues that by reason of the denials of those motions he was not permitted to cross-examine Steven R. Hansen after Steven R. Hansen testified in his own behalf, and secondly that it resulted in Roland C. Hansen being called as a witness by Steven R. Hansen necessitating his objection before

the jury to his prejudice. Roland C. Hansen did not testify during the trial.

The difficulty first arose when counsel for Roland C. Hansen endeavored to cross-examine Steven R. Hansen with questions which were viewed by the court as leading. The use of leading questions is controlled by Rule 611(c), Federal Rules of Evidence.[2] Roland C. Hansen claimed that Steven R. Hansen was an adverse witness entitling him to the right to cross-examine. However, Roland C. Hansen was fully permitted to examine Steven R. Hansen by the use of questions not considered to be leading. What evidence may have been foreclosed by the restrictions on the form of the questions is not suggested. Our examination of the record strongly suggests that although the father and son were not adverse to each other, their counsel may have been. Not only did Steven R. Hansen not implicate Roland C. Hansen by any response, he consistently endeavored to totally exonerate his father.[3]

**2.** Rule 611(c) provides:

(c) Leading Questions.—Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

**3.** For example, during direct examination these questions were asked and these answers given by Steven R. Hansen:

Q. Now, he testified here in this courtroom that he was present during hundreds of conversations that your father was also present at where the three of you discussed arsons. What is your knowledge of the truth about that?

A. My father was never present at any such conversations involving arson. It wouldn't—it was not simply—it wouldn't be permitted. He never brought me up that way, and totally ridiculous that these persons are saying that he was aware of any of these buildings that were burned by their ownselves. I can not even believe it to this day that they would come in here and make admissions against my father who has been in business for over twenty years and successful and never even had one fire on any of his properties. I don't think that they should be

permitted to even make such accusations as they did.

\* \* \* \* \* \*

Q. Did you—after the indictment came down, did you ever have occasion to discuss with Anton him telling the truth?

A. I have asked and told Robert Anton more than twenty times to come in here and say the truth and clear me and my father from this, and he stated that he was going to do so. When it came to the day before the trial, he was here and he did not do that. During examination of Steven R. Hansen by counsel for Roland C. Hansen, these questions were asked and these answers given:

Q. Why did Howard Bloom tell you that he had to frame you and your father?

A. Because he said that it wasn't enough for the Government to have Anton answer to other men in this trial, that they wanted a conspiracy to look like from the start to the end as to who was involved in this, and he even stated that he knew I wasn't involved, or my father wasn't involved in this.

Q. Was your father ever present at any meetings with Anton or anyone else wherein arson was discussed?

A. Never.

\* \* \* \* \* \*

Q. Did your father ever take that furnace?

A. No.

Q. At any time in 1974 to the present, was your father involved in any manner with any

Roland C. Hansen more specifically bases his objection upon statements incriminating to him which had been made by Steven R. Hansen to Bloom, the unindicted co-conspirator who testified under a grant of immunity. Some of those statements were taped by Bloom and the F.B.I. prior to indictment without the knowledge of Steven R. Hansen. Counsel for Roland C. Hansen attempts to develop a *Bruton*[4] error out of this circumstance because in his examination of Steven R. Hansen he was not permitted to "cross-examine." Counsel for Roland C. Hansen fairly points to some distinctions in his argument relying on *Bruton* and in certain other cases. In *Bruton*, a joint trial in which the confession of a nontestifying codefendant which implicated Bruton was admitted into evidence, it was held that an instruction to the jury limiting the confession to the codefendant was not sufficient. Roland C. Hansen also cites *United States v. Holt*, 483 F.2d 76 (5th Cir. 1973), another father and son trial, but in that case the damaging statements had been made by the father to the F.B.I. about the son's involvement. The father did not testify in an effort to explain away the damaging statements because he could have been impeached by his prior criminal record. The conviction was reversed on *Bruton* grounds. Roland C. Hansen concedes that these cases may be distinguished as in neither *Bruton* nor *Holt* did the codefendant testify, but argues that the distinction is inconsequential relying in part on *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971). In that case, which has some similarities to the present case, the court concluded that the Sixth Amendment

had not been violated "where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts." *Id.* at 629, 91 S.Ct. at 1727. The point that was unsuccessfully urged on the Court was that there could be no full and effective cross-examination when the codefendant denied making the inculpatory statement. In that case the defendant had nothing to gain by cross-examination. Again counsel brings to our attention the distinction that the damaging admissions in *Nelson* were not admissible under the co-conspirator exception to the hearsay rule.

Under Rule 801(d)(2)(E) of the Federal Rules of Evidence "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not considered hearsay. In *Bruton*, 391 U.S. at 128, n.3, 88 S.Ct. 1620, that Court noted that the inculpatory statement did not come within a recognized exception to the hearsay rule. No issue is raised on appeal that the inculpatory statements of Steven R. Hansen were not properly admitted under Rule 801. To attempt to overcome that distinction, Roland C. Hansen next refers us to *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). He concedes that in that habeas corpus case the court ruled that the admission of a statement of a co-conspirator under Georgia's co-conspirator exception, a broader exception than is recognized in federal conspiracy trials, did not deny appellant his Sixth Amendment right to confrontation where the co-conspir-

of your friends or your peers of your age, except to say "Hello"?

Mr. Martin: Object: leading.

Court: Sustained.

Mr. Donald Eisenberg:

Q. Did your father have any business dealings whatsoever with any of your friends in the 18 to 22 year age category?

A. No, he never did.

Q. In your conversation with Howard Bloom that was taped by Mr. Bloom, did you at any time admit that your father had any knowledge of any conspiracies to defraud anyone?

A. He never did so I could see it.

Q. Did you ever admit that your father was involved in any insurance fraud schemes?

A. No.

Mr. Donald Eisenberg: I have no further questions.

4. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

ator did not testify and was thus not subject to cross-examination. Roland C. Hansen argues that *Dutton*, however, turned on the fact that the admitted hearsay was not "crucial" or "devastating," 400 U.S. at 87, 91 S.Ct. 210, in contrast to the present case in which it is claimed Steven R. Hansen's testimony was crucial to the government's case. Even if we grant Steven R. Hansen's taped conversation to be critical evidence in the conviction of Roland C. Hansen, we do not read *Dutton* as requiring reversal. In the present case it must be remembered that Steven R. Hansen did testify, tried to explain away all his admissions and to help his father during direct examination, during his examination by counsel for Roland C. Hansen and during cross-examination by the government. Also a more limited hearsay exception is here involved than in *Dutton*. No objection is raised on appeal to the given conspiracy instruction.

Nor does *Brown v. United States*, 56 F.2d 997 (9th Cir. 1932), aid Roland C. Hansen. In that case a defendant testified in his own behalf but in doing so incriminated his co-defendant. It was held that the defendant, not just the government, had the right to cross-examine his testifying codefendant.

The situation in the present case may be distinguished as Steven R. Hansen did not incriminate Roland C. Hansen during his testimony.

Rule 611(c) uses the term "ordinarily" when providing that leading questions should be permitted on cross-examination. That qualification we are told by the Advisory Committee on Proposed Rules was "to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact. . . ." *See* 10 Moore's Federal Practice, § 611.31. That appears to cover the present case. The weight to be accorded the statements, taped or untaped, of Steven R. Hansen was for the jury. We find no prejudice to defendant Roland C. Hansen.

As a part of the severance issue, Roland C. Hansen next objects to the fact that Steven R. Hansen during the presentation of his defense called Roland C. Hansen as a witness causing Roland C. Hansen to object in the presence of the jury.[5] That what happened can easily be recognized as an error of potentially fatal consequences does not dispose of the issue in the circumstances of this case. Roland C. Hansen relies prin-

---

5. Immediately prior to this event the following dialogue took place between the attorney for Steven R. Hansen and the court:

Mr. Alan Eisenberg: Your Honor, I have a witness to call first, and that I believe should be done out of the presence of the jury, as to the calling of that witness. Request permission to do that now.

Court: Well, I decline that request. Call the jurors in. If there is need for an adjournment, I will grant it.

Mr. Alan Eisenberg: I don't think I should even say it in the presence of the jury.

(Jury returned to the courtroom at 1:47 o'clock P.M., and the following proceedings were had.)

Court: You have a witness to call at this time?

Mr. Alan Eisenberg: Defendant Steven Hansen calls Roland C. Hansen as his witness.

Mr. Donald Eisenberg: Your Honor, I object.

Court: We will entertain the objection to that in the absence of the jury. Will the jurors please return to the jury room?

After the objection of Roland C. Hansen and motions for mistrial or severance were overruled, the jury returned and was instructed as follows:

Court: Members of the jury, in a trial involving two defendants, one defendant may not call the other defendant as a witness and, therefore, the Court has not only sustained Mr. Donald Eisenberg's objection to having Mr. Roland Hansen called as a witness but I have admonished Mr. Alan Eisenberg that his effort to do so was improper.

You ladies and gentlemen must wholly disregard the effort of the counsel for Mr. Steven Hansen to have proposed calling the co-defendant, Roland Hansen, to the witness stand. That was an improper act. The Court could not permit it over objection, and Mr. Roland Hansen, through his counsel, did object. I have sustained that objection, and neither party could, even if he chose to, call the other party as a witness.

Will you please proceed, if you have other witnesses.

cipally upon *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965), in which this court commented that it would be prejudicial error for a defendant to call a codefendant as a witness against his wishes and force the codefendant to decline to testify in front of the jury, that, however, was not the holding in that case. Echeles, on trial with a codefendant, had moved for a severance on the ground, among others, that since it was anticipated that his codefendant was not going to testify and Echeles would not be permitted to call him as his witness, Echeles would be deprived of the favorable testimony of his codefendant holding Echeles blameless. Echeles was not to be required to actually call his codefendant to prove that his codefendant would refuse to testify. This court directed severance. In the present case, however, the issue on appeal is not that either Roland C. Hansen or Steven R. Hansen would be deprived of the exculpatory testimony of the other.

■ Two other cases are helpful. In *Coleman v. United States*, 137 U.S.App.D.C. 48, 420 F.2d 616 (D.C.Cir. 1969), the trial court permitted a codefendant to call each of his three codefendants as witnesses before the jury, knowing in advance that each would decline to testify. Counsel for the defendant also was permitted in closing argument to refer to his unsuccessful attempt to call his codefendants. Since it was not considered to be a close case on the question of guilt, it was held to be harmless error beyond a reasonable doubt. In *United States v. Barney*, 371 F.2d 166 (7th Cir. 1966), this court considered a similar problem. A defendant attempted twice in front of the jury to call his codefendant as a witness to which the codefendant objected. During closing argument, defendant's counsel made several comments about the fact his client testified which could be construed as reflecting on the codefendant's failure to

do the same. In contrast with other cases this court noted that in that case there were "no direct comments on a defendant's silence," nor did "the attempts to call the defendant to the stand add anything to the comments relied upon." At the time the effort was made to call Roland C. Hansen to the stand the jury heard from Roland C. Hansen only "Your Honor, I object." The trial was a series of objections about one thing or another, and no special significance could be attached to that particular objection. The Fifth Amendment privilege was not identified or mentioned before the jury. What happened did nothing more "than momentarily illuminate the obvious fact that the defendant did not choose to testify." *Id.* at 171.

■ The remaining issue raised by Roland C. Hansen is related as he objects to a brief comment by government counsel during long closing arguments which he argues is to be construed as a reference to Roland C. Hansen's failure to testify.[6] No objection was made at the time. *United States v. Reicin*, 497 F.2d 563, 572 (7th Cir. 1974), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269. The case against Roland C. Hansen was strong, but not as strong as the case against Steven R. Hansen, as the case against Steven R. Hansen was less circumstantial. Steven R. Hansen was more actively involved in the arson arrangements. That appears to be why the government several times during argument characterized Roland C. Hansen's part in the arson-for-profit scheme as an effort to insulate himself from the others by avoiding the day-to-day activities, dealing with the others through his son, and being guarded in his comments and conversations. Therefore, Roland C. Hansen was labeled as "the man in the shadows," a fair comment based on the evidence.

---

6. The comment of the government counsel was:

> Now in the few moments that I have left I would indicate to you that what do we have to show that Mr. R. C. Hansen is involved, the man in the shadows, the man who didn't tell about the everyday conversations. We

called Chris Caras, Bill Zoesch, and a lot of other people to come in and testify about their conversations, but Mr. R. C. Hansen stayed in the background. Did he have a motive? I suggest to you he did. With these arm's-length transactions between he and his son, I suggest to you that he did.

Viewed in the context of the whole case, either by itself or in conjunction with Steven R. Hansen's effort to call Roland C. Hansen to the witness stand four days previously, we believe beyond a reasonable doubt that the comment was harmless error, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and within the holding of this court in *Barney.* The incident could only be lost from thought in the massive evidence of fires and fraud. The jury was instructed at the close of the trial that the burden of proof was on the government; that the defendant had to prove nothing, including his innocence; and that no inference of any kind could be drawn from the failure of defendant to testify. These trial incidents do not rise to the level of "a penalty imposed by courts for exercising a constitutional privilege." *Griffin v. California,* 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965).

## II.

### *Steven R. Hansen's Issues*

It is urged that the trial judge erred by denying Steven R. Hansen his Sixth Amendment right to confrontation by restricting the examination of witnesses as to bias, motive and interest affecting the credibility of the government's key witnesses. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). If that were so, there would be reversible error, but the right to explore those matters is not without some reasonable limitation within the sound discretion of the trial judge. We find no abuse of discretion. *Alford v. United States,* 282 U.S. 687, 692–94, 51 S.Ct. 218, 75 L.Ed. 624 (1931); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir. 1974); *United States v. Allegretti,* 340 F.2d 254 (7th Cir. 1964), *cert. denied,* 390 U.S. 908, 88 S.Ct. 830, 19 L.Ed.2d 876 (1968).

■ Steven R. Hansen complains primarily about limitations upon his cross-examination of Bloom. Where to draw the line is not always a matter of precise determination, but the trial court need not in the reasoned exercise of its discretion permit continuous forays and excursions outside of the issues of the case merely because it is argued that the credibility of the witnesses will somehow be affected. In allowing for searching cross-examination the trial judge does not need to go so far as to permit the trial to be converted into a trial of the witness on collateral matters rather than of the defendant on the charge in the indictment. In his final argument the attorney for Steven R. Hansen reminded the jury that he had cross-examined Howard Bloom for ten hours, and that he "would love to spend another ten hours discussing it with the jury." If a ruling by the trial judge here or there amidst the 1300 questions propounded by Steven R. Hansen to Bloom might be considered questionable, those cross-examination rulings cannot in any way be characterized as denying Steven R. Hansen his constitutional right of confrontation. It is not necessary to permit ad infinitum pursuit of some alleged clue of bias, motive and interest to add to an accumulation of similar evidence bearing on the lack of credibility of the witness under attack.

The defense admitted that there was a conspiracy, but claimed that it was between the government and its principal witnesses. Bloom's own father was called and testified that his son could not be believed. In final arguments the attorney for Steven R. Hansen described Bloom as a "flim-flam man," a "con man," a "hustler," a "despicable human being," and the other principal witnesses of the government as convicted felons, thugs and liars. Those extreme accusations are not entirely without support in the record as the unsavory character of the witnesses had been sufficiently established. However, the jury chose to believe the government's witnesses rather than Steven R. Hansen.

■ Next, Steven R. Hansen objects to the hearsay nature of the testimony of a government witness who testified in his official capacity as a supervisor of the

building inspection division of the city about the building code violations records kept under his supervision. His testimony was primarily foundation for the exhibits and an explanation of their contents which noted the deficiencies of the buildings which had been burned. The witness did not claim first-hand knowledge of any specific building code violations. The records were admitted as those kept in the course of regularly conducted activity under Rule 803(6) of the Federal Rules of Evidence. Steven R. Hansen relies on *United States v. American Cyanamid Co.*, 427 F.Supp. 859 (S.D.N.Y.1977), to the effect that Rule 803(6) is not applicable to government records and that only Rule 803(8) applies.[7] Steven R. Hansen then argues that under Rule 803(8) the records are not admissible as the building inspectors were "law enforcement personnel" and thus no exception should be accorded. We need not consider the admissibility of the records under Rule 803(6) as in any event we agree with Steven R. Hansen that Rule 803(8) is applicable, but we disagree with his application of the rule in the circumstances in this case. It was argued to the trial judge by Steven R. Hansen that the enforcement of the building code was a "quasi-criminal" procedure. It appears that failure to comply with the building code may result in a fine, but not in a criminal conviction. We do not believe we are justified in broadening the interpretation of the rules phrase "police officers and other law enforcement personnel" to include city building inspectors. There was ample other unobjectionable first-hand testimony about the poor condition of the burned buildings so as to render the city's records on building conditions only cumulative, and at most harmless error.

■ The last issue of substance arises because of possible prejudice from the fact that the government in connection with the two perjury counts called as its witness the foreman of the grand jury which had indicted the defendants. That the necessary showing of the materiality of the alleged perjurious statements is an issue for the court and not the jury is of long standing and conceded by the government. *Sinclair v. United States*, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692 (1929); *United States v. Damato*, 554 F.2d 1371, 1372–73 (5th Cir. 1977); *United States v. Wesson*, 478 F.2d 1180 (7th Cir. 1973); *United States v. Parker*, 244 F.2d 943 (7th Cir. 1957), *cert. denied*, 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48. Not only is materiality primarily a matter of law for the court to determine, but were it otherwise there would be opened the opportunity for prejudicial testimony not otherwise admissible. In this case the matter was compounded by reason of the office the witness held as foreman of the grand jury. The jury was instructed that the foreman's testimony was limited to Steven R. Hansen, and Roland C. Hansen does not raise the issue on appeal.

The government seeks to defend its actions by arguing that the foreman's testimony was relevant for more reasons than materiality. The government argues that calling the foreman was justified because the foreman also testified that Steven R. Hansen, whom the foreman identified, was placed under oath and because the foreman "placed the defendant's testimony in its proper context." The foreman was asked by the government and permitted over objection to state what the "relevance" was of certain questions propounded to and answers given by Steven R. Hansen before the grand jury. He was further questioned

---

7. Rule 803(8) provides:

   (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

by the government in general terms about the various questions asked Steven R. Hansen and his responses which were claimed to be perjurious. The court and jury should be able to place the defendant's allegedly perjurious testimony in "proper context" without help from the foreman of the grand jury. Among other things the foreman explained the grand jury was looking into the matter of drugs and other statutes which he couldn't recall. Drugs were not involved in this trial. In any event, the government argues, the harm done was due to the prolonged cross-examination of the grand jury foreman by Steven R. Hansen. His cross-examination fully explored the consideration or alleged lack thereof given by the grand jury to the events involved in the perjury counts. What followed during that cross-examination we view as totally inappropriate for petit jury consideration. The government occasionally objected during the cross-examination on the basis that a particular question was beyond the scope of the direct or was immaterial, but otherwise the government sat by while the extensive inquiry was made into how and why the grand jury indicted Steven R. Hansen for perjury. The foreman made a good government witness during both direct and cross-examination provided there need be no concern about a fair trial. That some of the harm resulted from cross-examination is no saving excuse for the government.

Nothing appears in the record to suggest why it was necessary that the matter of materiality be heard by the jury. The grand jury transcript could have been examined by the court to determine materiality as the basis for an instruction on that issue to the jury. If necessary for some reason the grand jury reporter could have been called to testify about the record on some limited issue. We are always concerned lest a jury consider an indictment to be something more than it is intended to be. The jury is usually fully instructed in that regard, but when the foreman of the grand jury is called without any sufficient reason and in effect justifies the grand jury's actions and the resulting indictment, all precautions about the undue influence of the indictment are very likely for naught. The foreman of the grand jury should not become a champion of the grand jury's indictment and a partner of the government in seeing to the successful prosecution of the case. We consider that the government by calling the foreman without any apparent necessity initiated and then condoned continued prejudicial error. What the government needed to prove to the judge alone could easily have been accomplished without such a prejudicial potential which, if it was not, should have been anticipated. We will not approve what occurred in this case.

Steven R. Hansen also questions the sufficiency of the evidence to establish that he was guilty of perjury. We need not reach that issue in view of our ruling on the prior issue relating to the grand jury foreman.

Steven R. Hansen claims that the trial judge became so biased as to deny him a fair trial. The charge is baseless. It was a long and difficult trial.

Finally, Steven R. Hansen argues that the sentences imposed upon him were based upon improper considerations. As we understand the argument, it is based upon the claim that the trial judge misconceived Steven R. Hansen's role in the arsons because of the alleged curtailment of the examination of witnesses, and also because of his overlooked good rehabilitative possibilities. We see no merit whatsoever in the argument. We see no error in the sentencing procedure. Sentencing is recognized as a matter in the discretion of the trial judge and we will not interfere.

The convictions of Roland C. Hansen are affirmed. The convictions of Steven R. Hansen are affirmed, except as to Counts 24 and 25, the perjury counts, which are reversed and remanded for a new trial.